## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | CHAPTER 7 |
| GREGORY J. FUSELIER, | ) | CASE NO. 09-11536 |
| | ) | SECTION A |
| Debtor. | ) | |
| ------------------------------------------------------- | ) | |
| TRI INVESTMENTS, INC. and OLD | ) | |
| EDWARDS INN AND SPA, LLC, | ) | |
| | ) | |
| Plaintiffs, | ) | ADVERSARY PROCEEDING |
| | ) | |
| v. | ) | NO. 09-01112 |
| | ) | |
| GREGORY J. FUSELIER, | ) | |
| | ) | |
| Defendant. | ) | |

## FINDINGS OF FACT, CONCLUSIONS OF LAW
## AND JUDGMENT BY DEFAULT

Upon the unopposed Motion of Plaintiffs TRI Investments, Inc. ("TRI"), and Old Edwards Inn and Spa, LLC ("OEI") for Entry of Judgment of Default against the Defendant herein, Gregory J. Fuselier, on the claims contained in TRI's and OEI's Verified Complaint Objecting to the Dischargeability of Certain Debts (the "Verified Complaint"), the Court makes the following Findings of Fact and Conclusions of Law, and enters judgment accordingly:

### I. PROCEDURAL POSTURE

1.      TRI and OEI filed their Verified Complaint against the debtor, Gregory J. Fuselier ("Greg Fuselier"), on August 24, 2009.  [Doc. 1].  Mr. Fuselier filed no answer or other response to the Verified Complaint.

2.      TRI and OEI filed their Motion for Entry of Default on October 23, 2009 [Doc. 8], and the Clerk of Court executed the Entry of Default against Mr. Fuselier on October 27, 2009.  [Doc. 9].

3.      On November 9, 2009, Plaintiffs filed their Motion for Entry of a Default Judgment against Mr. Fuselier.  [Doc. 11].  No opposition has been filed to the Motion for Entry of a Default Judgment against Mr. Fuselier.

4.      On November 18, 2009, Plaintiffs filed a Notice of Hearing which provided notice that a hearing to consider and rule on the Motion for Entry of a Default Judgment against Mr. Fuselier and any objections thereto would be held on December 8, 2009, at 2:00 PM. [Doc. 15].  Mr. Fuselier did not file any response to the Notice of Hearing.

5.      On December 8, 2009, the Court held a hearing on the Motion for Entry of a Default Judgment against Mr. Fuselier.

6.      In making this Findings of Fact, the Court is guided by the following legal principles.

> The defendant, by his default, admits the plaintiff's well-pleaded allegations of fact, is concluded on those facts by the judgment, and is barred from contesting on appeal the facts thus established. [cites omitted].  A default judgment is unassailable on the merits but only so far as it is supported by well-pleaded allegations, assumed to be true.

Nishimatsu Constr. Co., Ltd. v. Houston Nat'l Bank, 515 F.2d 1200, 1206 (5th Cir. 1975).

"For purposes of a default judgment, plaintiff's well-pleaded factual allegations are taken as true-except regarding damages."  United States v. Givens, 2009 WL 1362764, *5 (W.D. La. 2009), citing United States for Use of M-CO Constr., Inc. v. Shipco General, Inc., 814 F.2d 1011, 1014 (5th Cir. 1987).  "In lieu of a hearing on damages, the court may award the appropriate remedy by relying upon detailed affidavits, documentary evidence, and its personal knowledge of the record to award damages."  Givens, 2009 WL 1362764, at *5.

- 2 -

> An evidentiary hearing is unnecessary when the damages are liquidated or capable of mathematical calculation based on reference to pleadings and evidence. *James v. Frame*, 6 F.3d 307, 310 (5th Cir. 1993). "[L]iquidated damages are those either agreed upon by the parties in a contract, or fixed by operation of law." *Beachhead, L.P. v. Solar Nigh Indus., Inc.*, 2008 WL 4692856, at *1 (N.D. Tex. Oct. 23, 2008) (citing *Super 8 Motels, Inc. v. Kumar*, 2008 WL 878426, at *4 (D.N.J. Apr. 1, 2008)).

Cycle Sport, L.L.C. v. Dinli Metal Indus. Co., Ltd., 2008 WL 4791544, *5 (N.D. Tex. 2008).

7.     Federal Rule of Civil Procedure 55(b)(2), which governs the entry of a default judgment, is made applicable to this Adversary Proceeding by Federal Rule of Bankruptcy Procedure 7055.

8.     Accordingly, the Court makes the following Findings of Fact based upon the well pleaded allegations of the Verified Complaint cited below, as well as the damages evidence cited below.

9.     TRI makes claims against Greg Fuselier in Counts One through Four of the Verified Complaint, while OEI makes claims against Mr. Fuselier in Counts Five through Nine of the Verified Complaint.  These Counts are addressed in turn below.

## II.  FINDINGS OF FACT

### A.  TRI - Count One - Commercial bribery – Findings of Fact

1.     TRI seeks to recover under Count One of the Verified Complaint for Greg Fuselier's commercial bribery of TRI's agents on construction projects in the state of North Carolina. [Doc. 1].

2.     At all times relevant hereto, Greg Fuselier, was a controlling owner of Cornerstone Homes of Highlands, LLC ("Cornerstone"), a general contractor in Highlands, North Carolina.  [Verified Complaint, ¶ 8].

3.      Greg Fuselier arranged for Cornerstone to act as general contractor for TRI and OEI on a number of construction projects, including a TRI owned project to construct fourteen cottages in the Satulah Village-South development.  [Verified Complaint, ¶ 9].

4.      At all times relevant hereto, Mario Gomes was an agent of both OEI and TRI, with authority to employ service or labor on behalf of OEI and TRI, including engaging contractors and vendors on the construction projects at issue in this case.  [Verified Complaint, ¶ 31].

5.      Before he was fired for self-dealing, Mario Gomes was in charge of the construction projects at issue for TRI and OEI, and had authority to hire and fire contractors and other vendors on these projects.  [Verified Complaint, ¶ 17].

6.      Working under an agreement he reached with Greg Fuselier, Mario Gomes awarded TRI and OEI construction contracts to Cornerstone in exchange for kickbacks that Greg Fuselier paid to Mario Gomes out of the unlawfully inflated profits Cornerstone made working for OEI and TRI.  [Verified Complaint, ¶ 20].

7.      As part of the arrangement, Greg Fuselier secretly made Mario Gomes a *de facto* partner in Cornerstone so that Gomes would award TRI and OEI contracts to Cornerstone, and so that Gomes would cooperate with Fuselier in improperly increasing Cornerstone's profits on these projects at TRI's and OEI's expense.  [Verified Complaint, ¶ 19].

8.      At all times relevant hereto, George Mathis was an agent of both OEI and TRI, with authority to employ service or labor on behalf of OEI and TRI, including engaging contractors and vendors on the construction projects at issue in this case.  [Verified Complaint, ¶ 32].  In this role, George Mathis helped Mario Gomes and Greg Fuselier to effectuate the kickback scheme described herein.  [Verified Complaint, ¶ 21].

- 4 -

9.      Greg Fuselier and Mario Gomes divided up and shared the inflated profits that Cornerstone made at TRI's and OEI's expense on these construction projects, giving a portion of the inflated profits to George Mathis, in exchange for his cooperation in effectuating their kickback scheme.  [Verified Complaint, ¶ 22].

10.     These kickbacks to Mario Gomes and George Mathis were secretly paid by Greg Fuselier in 39 different payments in the course of a one year period of time while Mario Gomes and George Mathis assisted Greg Fuselier in inflating the profit Cornerstone made on TRI projects. [Verified Complaint, ¶ 39].[1]

11.     Greg Fuselier paid Mario Gomes a total of $331,182.43 in kickbacks out of Cornerstone's inflated profits on the Satulah Village-South project.  [Verified Complaint, ¶ 36; Gomes Depo. (Doc. 11-5), pp. 128 – 131, 149 – 186, and 211 – 222].

12.     Greg Fuselier paid George Mathis a total of $21,766 in kickbacks out of Cornerstone's inflated profits on the Satulah Village-South project.  [Verified Complaint, ¶ 37; Mathis Depo, (Doc. 11-3), 121:9-25; 157:6-11].

13.     Greg Fuselier paid a total of $352,948.43 in kickbacks to Mario Gomes and George Mathis on the Satulah Village-South project under this kickback scheme.  [Verified Complaint, ¶ 39].

14.     Greg Fuselier's above-described conduct was in or affecting commerce.  [Verified Complaint, ¶¶ 167 – 169].

---

[1] The 39 checks are exhibits to the depositions of Mario Gomes [Doc. 11-5] and George Mathis [Doc. 11-3].  The 39 checks are attached to Deposition of Mario Gomes, at Exhibits 21, 23, 26 – 32, 34, 36, 38 – 55, 58 – 63, 73 – 76, and discussed in his deposition on pages 128 – 131, 149 – 186, and 211 – 222; see also checks attached to Deposition of George Mathis, at Exhibits 13, 15, 17, and 19, and discussed in his deposition on pages 113 – 121.

**B.  TRI - Count Two - Fraudulent Billing on Fifth Street Project – Findings of Fact**

1.      TRI seeks to recover under Count Two of the Verified Complaint for Greg Fuselier's misrepresentations regarding the costs Cornerstone incurred on the Fifth Street project. [Doc. 1].

2.      After Greg Fuselier secretly made Mario Gomes a *de facto* partner in Cornerstone, Mario Gomes awarded Cornerstone a TRI contract to act as general contractor on the Fifth Street project.  [Verified Complaint ¶ 48].

3.      Greg Fuselier and Mario Gomes agreed that Cornerstone would perform the Fifth Street project for TRI on a cost plus basis.  [Verified Complaint ¶ 49].

4.      Under a cost plus billing arrangement, a general contractor is typically paid an amount equal to the cost it reasonably and properly incurs for subcontracted work and materials, plus a fee equal to a percentage of such costs for its profit and overhead.  [Verified Complaint ¶ 47].

5.      On the Fifth Street project, Cornerstone was to be paid by TRI an amount equal to the cost Cornerstone incurred for subcontracted work and materials, plus a fee equal to 20% of such costs for Cornerstone's profit and overhead.  [Verified Complaint ¶ 51].

6.      Greg Fuselier took advantage of the cost plus arrangement by preparing and submitting Cornerstone invoices to TRI which deliberately misrepresented and overstated the costs Cornerstone incurred for subcontracted work and materials on the Fifth Street project. [Verified Complaint ¶ 52].

7.      The inflated invoices Greg Fuselier prepared and submitted to TRI for the Fifth Street project misrepresented that Cornerstone's total cost for subcontracted work and materials on the project was $114,110.00.  [Verified Complaint ¶ 53].

- 6 -

8.      Invoices submitted to Greg Fuselier by Cornerstone's subcontractors show that Cornerstone's total cost for subcontracted work and materials on the Fifth Street project was actually only $72,444.21.  [Verified Complaint ¶ 54].

9.      The unlawfully inflated invoices Greg Fuselier prepared for Cornerstone also added a 20% mark up for overhead and profit to these inflated costs so that Greg Fuselier overstated Cornerstone's invoices on the Fifth Street project by a total of $49,704.15.  [Verified Complaint ¶ 55].

10.     TRI paid Cornerstone the full amount of the inflated invoices in reasonable reliance on the misrepresentations that Greg Fuselier made in those invoices.  [Verified Complaint ¶ 56].

11.     TRI sustained $49,704.15 in damages when it overpaid Cornerstone the full amount of Greg Fuselier's fraudulently inflated invoices on the Fifth Street project.  [Affidavit of Catrina Carpenter ("Carpenter Aff., ¶ 3].

12.     Greg Fuselier's above-described conduct was in or affecting commerce.  [Verified Complaint, ¶¶ 167 – 169].

**C.  TRI - Count Three – Fraudulent Billing - Custom Shelving – Findings of Fact**

1.      TRI seeks to recover under Count Three of the Verified Complaint for misrepresentations relating to custom shelving that Greg Fuselier made in Cornerstone invoices that he prepared and submitted to TRI on the Satulah Village-South project.  [Doc. 1].

2.      After Greg Fuselier secretly and unlawfully made Mario Gomes a *de facto* partner in Cornerstone, Greg Fuselier agreed that Cornerstone would act as the general contractor on a project to add an addition to Mario Gomes' private residence ("the Gomes Addition").  [Verified Complaint ¶ 60].

3.      Greg Fuselier agreed with Mario Gomes that Cornerstone would act as the general contractor on the Gomes Addition free of charge.  [Verified Complaint ¶ 61].

4.      While Cornerstone was acting as the general contractor on the Gomes Addition, it was simultaneously acting as the general contractor for TRI on the Satulah Village-South project. [Verified Complaint ¶ 62].

5.      Working with Mario Gomes and George Mathis, Greg Fuselier secretly blended costs incurred on the Gomes Addition into Cornerstone invoices which were submitted to TRI on the Satulah Village-South project.  As a result, TRI was deceived into paying for costs incurred in renovating Mario Gomes' home.  [Verified Complaint ¶ 63].

6.      Greg Fuselier prepared and submitted an invoice to TRI that improperly charged TRI for $3,377.48 worth of custom shelving, knowing that Cornerstone's subcontractor, Shelving Plus, installed the custom shelving on Mario Gomes' personal residence and on George Mathis' personal residence rather than on the Satulah Village-South project.   [Verified Complaint ¶ 64].

7.      Although this custom shelving was installed on Mario Gomes' and George Mathis' personal residences, Greg Fuselier knowingly and secretly blended these costs into Cornerstone Invoice No. 404 that he submitted to TRI on the Satulah Village-South project on January 7, 2008.  [Verified Complaint ¶ 65].

8.      Greg Fuselier also added a 20% mark up to Cornerstone's January 7, 2008 Invoice No. 404 for Cornerstone's purported overhead and profit on this custom shelving work, despite the fact that $3,377.48 of this work was for work on Mario Gomes' and George Mathis' personal residences, and not for the Satulah Village-South project.  [Verified Complaint ¶ 66].

- 8 -

9.      In reasonable reliance on Greg Fuselier's misrepresentations, TRI paid Cornerstone $4,052.00 for work performed on Mario Gomes' and George Mathis' personal residences.  [Verified Complaint ¶ 67].

10.     As a result of the above-described misrepresentation by Greg Fuselier, TRI sustained $4,052.00 in damages when it paid Cornerstone $4,052.00 more than Cornerstone was lawfully entitled to receive.  [Carpenter Aff., ¶ 4].

11.     Greg Fuselier's above-described conduct was in or affecting commerce.  [Verified Complaint, ¶¶ 167 – 169].

### D.  TRI - Count Four – NCI Kickbacks – Findings of Fact

1.      TRI seeks to recover under Count Four of the Verified Complaint for Greg Fuselier's participation in a scheme under which he received kickbacks from a vendor on the Satulah Village-South project.  [Doc. 1].

2.      After Greg Fuselier had secretly made Mario Gomes a *de facto* partner in Cornerstone, Greg Fuselier, Mario Gomes, and George Mathis intentionally harmed TRI by working together to improperly increase Cornerstone's profits on the Satulah Village-South project.  [Verified Complaint ¶ 71].

3.      National Communications Inc. ("NCI") submitted a bid to TRI to supply security, fire, sound systems, and data connections on the Satulah Village-South project.  NCI submitted its bid directly to Mario Gomes as TRI's Representative.  [Verified Complaint ¶ 72].

4.      Although NCI was not a Cornerstone subcontractor, Mario Gomes and Greg Fuselier decided that Cornerstone should be paid 20% of all amounts that TRI paid to NCI. [Verified Complaint ¶ 73].

5.      Pursuant to the arrangement he worked out with Greg Fuselier, Mario Gomes told NCI that its bid would be accepted only if NCI increased the amount it charged TRI by 20%, and

- 9 -

only if it agreed to pay this extra 20% to Cornerstone each time NCI received progress payments from TRI. [Verified Complaint ¶ 74].

6.        As a result of this scheme, NCI charged TRI 20% more on the Satulah Village-South project so that NCI could make these required kickback payments to Cornerstone. [Verified Complaint ¶ 75].

7.        Under this kickback arrangement, NCI made $22,434.00 in payments to Cornerstone after NCI received payments from TRI. [Verified Complaint ¶ 76]. Greg Fuselier received the $22,434.00 NCI paid to Cornerstone, knowing they were unlawful kickbacks to Cornerstone. [Verified Complaint ¶ 78].

8.        Unaware of this scheme, TRI issued payment to NCI for the full and secretly inflated amount of its invoices. [Carpenter Aff., ¶ 5]. This deception resulted in losses to TRI in the amount of $22,434.00. [Carpenter Aff., ¶ 5].

9.        Greg Fuselier's above-described conduct was in or affecting commerce. [Verified Complaint, ¶¶ 167 – 169].

10.       In summary, TRI sustained a total of $429,138.58 in losses as a result of the conduct of Greg Fuselier, as described in Counts One through Four of the Verified Complaint. [Carpenter Aff., ¶¶ 1 – 5].

### E. OEI - Count Five – Fraudulent Billing - Carpentry – Findings of Fact

1.        Plaintiff OEI is a wholly owned subsidiary of Plaintiff TRI. [Verified Complaint, ¶ 6].

2.        OEI seeks to recover under Count Five of the Verified Complaint for Greg Fuselier's misrepresentations regarding costs Cornerstone incurred for carpentry work on the OEI Renovation project. [Doc. 1].

- 10 -

3.      After Greg Fuselier unlawfully made Mario Gomes a *de facto* partner in Cornerstone, Mario Gomes awarded Cornerstone an OEI contract to act as general contractor for OEI on the OEI Renovation project under a cost plus billing arrangement.  [Verified Complaint ¶ 82].

4.      Under the cost plus arrangement for the OEI Renovation project, Cornerstone was to be paid an amount equal to the cost Cornerstone reasonably and properly incurred for subcontracted work and materials, plus a fee equal to 20% of such costs for Cornerstone's profit and overhead.  [Verified Complaint ¶ 83].

5.      Greg Fuselier took advantage of the cost plus arrangement by submitting invoices to OEI which deliberately misrepresented and overstated the costs Cornerstone incurred for subcontracted work and materials on the OEI Renovation project.  [Verified Complaint ¶ 86].

6.      Dream Works Visions, Inc. ("Dream Works") performed carpentry work as a subcontractor to Cornerstone on the OEI Renovation project.  [Verified Complaint ¶ 87].

7.      Dream Works' invoices demonstrate that it billed Cornerstone a total of $226,098.00 for carpentry work on the OEI Renovation project.  [Verified Complaint ¶ 88].

8.      Nevertheless, Greg Fuselier submitted Cornerstone invoices to OEI which misrepresented and overstated these costs as being $421,617.00.  Thus, Greg Fuselier's invoices to OEI overstated Cornerstone's costs for Dream Works' carpentry work by a total of $195,519.00.  [Verified Complaint ¶ 89].

9.      Greg Fuselier then added a 20% fee onto this overstated amount resulting in an additional amount of $39,103.80 that he improperly added on to Cornerstone's invoices to OEI for this carpentry work.  [Verified Complaint ¶ 90].

WCSR 4254904v1

10.    Thus, Cornerstone over charged OEI a total of $234,622.80 as a direct result of Greg Fuselier overstating the costs Cornerstone incurred for this carpentry work. [Verified Complaint ¶ 90].

11.    Greg Fuselier submitted these Invoices to OEI with full knowledge of the above-described misrepresentations and with the intent to deceive and mislead OEI. [Verified Complaint ¶¶ 94, 98, 102, 106, 110, 114].

12.    In reasonable reliance on the misrepresentations Greg Fuselier made in Cornerstone's Invoices, OEI paid Cornerstone the full amount of the misrepresented carpentry costs together with a 20% mark up for Cornerstone's purported overhead and profit. [Verified Complaint ¶¶ 95, 99, 103, 107, 111, 115].

13.    In reliance on these misrepresented and overstated invoices, OEI issued payment to Cornerstone in the full overstated amount of these Cornerstone invoices, resulting in damages to OEI in the amount of $234,622.80. [Carpenter Aff., ¶ 6].

14.    Greg Fuselier's above-described conduct was in or affecting commerce. [Verified Complaint, ¶¶ 167 – 169].

**F.  OEI - Count Six – Fraudulent Billing – Heated Flooring – Findings of Fact**

1.    OEI seeks to recover under Count Six of the Verified Complaint for Greg Fuselier's misrepresentations regarding costs Cornerstone incurred for heated flooring on the OEI Renovation project. [Doc. 1].

2.    Greg Fuselier arranged for Cornerstone to sub-contract with Heavenly Heated Floors for the installation of heated flooring on the OEI Renovation project. [Verified Complaint ¶ 118].

- 12 -

3.      Invoices that Heavenly Heated Floors submitted to Greg Fuselier demonstrate that Cornerstone incurred only $35,036.00 in costs from Heavenly Heated Floors for the installation of heated flooring on the OEI Renovation project.  [Verified Complaint ¶ 119].

4.      Although Cornerstone only paid $35,036.00 for this heated flooring, Greg Fuselier submitted Cornerstone's Invoice number 102 to OEI on January 29, 2008, in which he intentionally misrepresented to OEI that Cornerstone's costs for this same heated flooring was $80,000.00.  [Verified Complaint ¶ 120].

5.      Thus, in Cornerstone's January 29, 2008 Invoice number 102, Greg Fuselier intentionally overstated Cornerstone's costs for this heated flooring by $44,964.00.  [Verified Complaint ¶ 121].

6.      Greg Fuselier then added a 20% fee onto this overstated amount in Cornerstone's Invoice number 102 resulting in an additional amount of $8,992.80 that he improperly added on to Cornerstone's January 29, 2008 Invoice number 102 for heated flooring.  [Verified Complaint ¶ 122].

7.      The total amount by which Greg Fuselier improperly inflated Cornerstone's January 29, 2008 Invoice number 102 for this heated flooring was $53,956.80.   [Verified Complaint ¶ 123].

8.      Greg Fuselier submitted Cornerstone's Invoice number 102 to OEI with full knowledge of the above-described misrepresentations and with the intent to deceive and mislead OEI.  [Verified Complaint ¶ 124].

9.      In reasonable reliance on Greg Fuselier's misrepresentations in Cornerstone's Invoice number 102, OEI paid Cornerstone the full amount of its inflated invoice for heated flooring. [Verified Complaint ¶ 125].

- 13 -

10.    OEI's payment to Cornerstone in the full amount of the inflated invoice for heated flooring resulted in OEI paying Cornerstone $53,956.80 more than it was entitled to receive under the cost plus billing arrangement described above.  [Verified Complaint ¶ 125].  Thus, OEI sustained damages in the amount of $53,956.80 when it paid this inflated invoice.  [Carpenter Aff., ¶ 7].

11.    Greg Fuselier's above-described conduct was in or affecting commerce.  [Verified Complaint, ¶¶ 167 – 169].

### G.  OEI - Count Seven – Fraudulent Billing – Marble – Findings of Fact

1.    OEI seeks to recover under Count Seven of the Verified Complaint for Greg Fuselier's misrepresentations regarding costs Cornerstone incurred for marble on the OEI Renovation project.  [Doc. 1].

2.    Invoices that Inman Park Marble & Granite ("Inman") submitted to Cornerstone's Greg Fuselier demonstrate that Inman charged Cornerstone $77,331.00 for basket weave white Carrara marble installed on the OEI Renovation project. [Verified Complaint ¶ 128].

3.    Greg Fuselier misrepresented in Cornerstone's Invoice number 102 that the cost incurred from Inman was $111,750.00 for this marble.  Thus, the Invoice number 102 that Greg Fuselier prepared for Cornerstone misrepresented and overstated Inman's charges for this basket weave white Carrara marble by $34,419.00.  [Verified Complaint ¶ 129].

4.    Greg Fuselier then added a 20% fee onto this overstated amount in Cornerstone's Invoice number 102 resulting in an additional amount of $6,883.80 that Greg Fuselier charged OEI for this marble.  Thus, Greg Fuselier's misrepresentation of Cornerstone's costs for this marble resulted in Cornerstone charging OEI an additional $41,302.80 for this marble in its January 29, 2008 Invoice number 102.  [Verified Complaint ¶ 130].

5.      Greg Fuselier submitted Cornerstone's Invoice number 102 to OEI with full knowledge of the above-described misrepresentations and with the intent to deceive and mislead OEI.  [Verified Complaint ¶ 132].

6.      In reasonable reliance on the misrepresentations Greg Fuselier made in Cornerstone's invoice number 102, OEI paid Cornerstone $41,302.80 more than it was entitled to receive for this marble under the cost plus billing arrangement described above.  [Verified Complaint ¶ 133].

7.      OEI sustained $41,302.80 in losses as a result of its paying Cornerstone $41,302.80 more than it was entitled to receive for this marble.  [Carpenter Aff., ¶ 8].

8.      Greg Fuselier's above-described conduct was in or affecting commerce.  [Verified Complaint, ¶¶ 167 – 169].

**H.  OEI - Count Eight – Fraudulent Billing – Electrical Work – Findings of Fact**

1.      OEI seeks to recover under Count Eight of the Verified Complaint for Greg Fuselier's misrepresentations regarding costs Cornerstone incurred for electrical work on the OEI Renovation project.  [Doc. 1].

2.      Edwards Electrical Service did work at the OEI Renovation project under a subcontract with Cornerstone.  [Verified Complaint ¶ 136].

3.      In late 2007, Edwards Electrical Service also did $15,188.26 worth of electrical work on Mario Gomes' personal residence in connection with the Gomes Addition.  [Verified Complaint ¶ 137].

4.      Greg Fuselier deceitfully blended this same $15,188.26 in costs from Edwards Electrical Service into Cornerstone's Invoice No. 102 for the OEI Renovation project, which Greg Fuselier submitted to OEI on January 29, 2008.  [Verified Complaint ¶ 138].

- 15 -

5.      Greg Fuselier also added a 20% mark up to this $15,188.26 increasing to $18,225.00 the amount that he over charged OEI for this work performed by Edwards Electrical Service on the Gomes Addition.  [Verified Complaint ¶ 139].

6.      Greg Fuselier submitted Invoice number 102 to OEI on behalf of Cornerstone with full knowledge of the above-described misrepresentations and with the intent to deceive and mislead OEI.  [Verified Complaint ¶ 140].

7.      In reasonable reliance on Greg Fuselier's misrepresentations in Invoice number 102, OEI was deceived into paying Cornerstone $18,225.00 for the cost of the work that Edwards Electrical Service did on the Gomes Addition.  [Verified Complaint ¶ 141].

8.      In reliance on Greg Fuselier's misrepresentations in Cornerstone's invoice, OEI paid Cornerstone the full amount invoiced by Mr. Fuselier, including the $18,225.00 of charges incurred in connection with the work performed by Edwards Electrical Service on Mario Gomes' personal residence. [Carpenter Aff., ¶ 9].  This deception resulted in losses to OEI in the amount of $18,225.00.  [Carpenter Aff., ¶ 9].

9.      Greg Fuselier's above-described conduct was in or affecting commerce.  [Verified Complaint, ¶¶ 167 – 169].

**I.  OEI - Count Nine – Fraudulent Billing – Grossly Excessive Costs – Findings of Fact**

1.      OEI seeks to recover under Count Nine of the Verified Complaint for Greg Fuselier's grossly excessive billing on the OEI Renovation project.  [Doc. 1].

2.      The Cornerstone invoices that Greg Fuselier prepared and submitted to OEI billed OEI a total of $1,431,346.92 for labor and material costs purportedly incurred by Cornerstone in connection with the OEI Renovation project.  [Verified Complaint ¶ 144].

- 16 -

3.      Given the scope of the work involved in the OEI Renovation project, the total amount of the costs that a general contractor could have reasonably incurred on the OEI Renovation project was no more than approximately $822,000.00.  [Verified Complaint ¶ 145].

4.      Thus, the total amount of costs that Cornerstone charged to OEI ($1,431,346.92) far exceeded the costs that a general contractor could have reasonably incurred on the OEI Renovation project by over $609,000.00.  [Verified Complaint ¶ 146].

5.      Given that a general contractor could not have reasonably incurred more than approximately $822,000.00 in costs on the OEI Renovation project, a 20% mark up for overhead and profit should have totaled no more than approximately $164,400.00.  [Verified Complaint ¶ 148].

6.      Thus, under a cost plus 20% contract, the most that a general contractor could have legitimately charged for the scope of work completed by Cornerstone on the OEI Renovation project is approximately $986,400.00. ($822,000.00 in costs plus $164,400.00 for profit and overhead).  [Verified Complaint ¶ 149].

7.      In bad faith and with the intent to deceive and damage OEI, Greg Fuselier submitted Cornerstone invoices to OEI on the OEI Renovation project in a total amount $1,775,216.78.  [Verified Complaint ¶ 150].

8.      Greg Fuselier submitted Cornerstone's inflated invoices to OEI in bad faith seeking to be paid almost $800,000.00 more than Cornerstone was entitled to receive under the cost plus billing arrangement described above.  [Verified Complaint ¶ 152].

9.      Before it discovered Greg Fuselier's misrepresentations, OEI paid Cornerstone $1,687,616.78 on the first 8 of the 10 Cornerstone invoices that Greg Fuselier submitted to OEI on the OEI Renovation project.  [Verified Complaint ¶ 153].

10.     The amount Cornerstone was paid for work on the OEI Renovation project ($1,687,616.78) exceeded the amount that a general contractor could have legitimately charged for the work by $701,217.00.  [Verified Complaint ¶ 154].

11.     Before OEI discovered that Greg Fuselier, Mario Gomes, and George Mathis were working together to improperly increase Cornerstone's profits, OEI unknowingly issued payments to Cornerstone in the total amount of $1,687,616.78 on the first 8 of the 10 Cornerstone invoices that Greg Fuselier submitted to OEI on the OEI Renovation project. [Carpenter Aff., ¶ 11].  Thus, OEI paid Cornerstone $701,217.00 more than Cornerstone could have legitimately charged for the work Cornerstone performed on the OEI Renovation project under the cost plus billing at issue.  [Verified Complaint ¶ 154; Carpenter Aff., ¶ 11].

12.     Included within the $701,217.00 that OEI overpaid Cornerstone (as described in Count 9 of the Verified Complaint) are the amounts OEI overpaid Cornerstone for carpentry work, heated flooring, basket weave white Carrara marble, and electrical work (as described in Counts 5, 6, 7 and 8 of the Verified Complaint).   [Carpenter Aff., ¶ 11].  Cornerstone's overbilling of OEI for carpentry work, heated flooring, basket weave white Carrara marble, and electrical work totals $348,107.40.  Thus, OEI sustained a net total of $353,109.72 in additional losses as a result of the overbilling described in Count Nine of the Verified Complaint. [Carpenter Aff., ¶ 11].

13.     Greg Fuselier's above-described conduct was in or affecting commerce.  [Verified Complaint, ¶¶ 167 – 169].

### III.  CONCLUSIONS OF LAW

#### A.  TRI - Count One – Commercial Bribery – Conclusions of Law

1.     North Carolina's commercial bribery statute provides as follows:

Any person who gives, offers or promises to an agent, employee or servant any gift or gratuity whatever with intent to influence his action in relation to his principal's, employer's or master's business; any agent, employee or servant who requests or accepts a gift or gratuity or a promise to make a gift or to do an act beneficial to himself, under an agreement or with an understanding that he shall act in any particular manner in relation to his principal's, employer's or master's business; any agent, employee or servant who, being authorized to procure materials, supplies or other articles either by purchase or contract for his principal, employer or master, or to employ service or labor for his principal, employer or master, receives, directly or indirectly, for himself or for another, a commission, discount or bonus from the person who makes such sale or contract, or furnishes such materials, supplies or other articles, or from a person who renders such service or labor; and any person who gives or offers such an agent, employee or servant such commission, discount or bonus, shall be guilty of a Class 2 misdemeanor.

N.C.G.S.A. § 14-353.

2.     The crime prohibited under N.C.G.S.A. § 14-353 is commonly referred to as "commercial bribery" under North Carolina law.  See e.g., State v. Brewer, 258 N.C. 533, 552-553, 129 S.E.2d 262, 276 (1963) ("If a person does the prohibited act or acts specified in this part of the statute with the intent explicitly stated therein, he is guilty of what is commonly called 'commercial bribery'").

3.     Thus, a person commits commercial bribery under North Carolina law by giving money or other consideration to an agent in return for the agent's efforts to further that person's interests in business dealings between him and the principal.  See N.C.G.S.A. § 14-353; Brewer, 258 N.C. at 554, 129 S.E.2d at 277 ("where an agent or employee receives money or other considerations from a person in return for the agent's or employee's efforts to further that person's interests in business dealings between him and the principal or employer, such an act or acts on the part of the agent or employee and on the part of the person who gives the money or other consideration to the agent or employee should be prohibited").

- 19 -

4.      Commercial bribery also gives rise to liability for civil damages under North Carolina law.  Kewaunee Scientific Corp. v. Pegram, 130 N.C. App. 576, 580, 503 S.E.2d 417, 419-420 (1998).

5.      Because he has elected to take a default on the claims at issue, Greg Fuselier has admitted by default the facts in the Verified Complaint establishing his liability for commercial bribery.  Nishimatsu Constr. Co., Ltd., 515 F.2d at 1206.  Thus, Greg Fuselier has admitted by default TRI's allegations that he paid bribes to TRI's agents, Mario Gomes and George Mathis, in exchange for their help in obtaining TRI contracts and in improperly increasing the profits that Cornerstone made at TRI's expense on the construction projects at issue.  [See Verified Complaint, at ¶¶ 25 – 46].

6.      Moreover, Greg Fuselier has admitted by default TRI's allegations that he wrote 39 checks to pay the bribes, and that the amount of the checks paid to TRI's agents totaled $352,948.43. [See Verified Complaint, at ¶¶ 36 – 39].  The depositions of TRI's former agents, who received the bribes, further substantiate of the amount of the bribes paid.[2]  Accordingly, the Court finds that Greg Fuselier is liable to TRI for his commercial bribery of TRI's agents.

7.      Under North Carolina law, "commercial bribery harms an employer as a matter of law, and the proper measure of damages suffered must include at a minimum the amount of the commercial bribes the third party paid."  Kewaunee Scientific Corp. v. Pegram, 130 N.C. App. 576, 580, 503 S.E.2d 417, 419-420 (1998).

---

[2] The $352,948.43 in bribes was paid via 39 checks that were each identified in the depositions of George Mathis and Mario Gomes, who were the recipients of these checks.  [See 39 checks attached to Deposition of Mario Gomes (Doc. 11-5), at Exhibits 21, 23, 26 – 32, 34, 36, 38 – 55, 58 – 63, 73 – 76, and discussed in his deposition on pages 128 – 131, 149 – 186, and 211 – 222; see also checks attached to Deposition of George Mathis, (Doc-11-3), at Exhibits 13, 15, 17, and 19, and discussed in his deposition on pages 113 – 121].

8.      As noted above, Greg Fuselier paid TRI's agents a total of $352,948.43 in commercial bribes.  Thus, TRI is presumed to have been damaged in that amount as a matter of law.  <u>Kewaunee Scientific Corp.</u>, 130 N.C. App. at 580, 503 S.E.2d at 419-420.

9.      Count One of the Verified Complaint alleges that Greg Fuselier's above-described commercial bribery also constituted a violation of N.C.G.S.A. § 75-1.1, the North Carolina Unfair and Deceptive Practices Act ("UDPA").  [See Verified Complaint, ¶¶ 44 – 46].  The UDPA provides civil liability for "unfair or deceptive acts or practices in or affecting commerce . . . ."  N.C.G.S.A. § 75-1.1.

10.     A cause of action under the UDPA has three elements.

> North Carolina's courts have interpreted these sections as requiring three elements for a prima facie claim for unfair trade practices. "Plaintiff must show: (1) defendant committed an unfair or deceptive act or practice, (2) the action in question was in or affecting commerce, and (3) the act proximately caused injury to the plaintiff."

<u>Kewaunee Scientific Corp.</u>, 130 N.C. App. at 580, 503 S.E.2d at 420.

11.     Under N.C.G.S.A. § 75-1.1, "'Commerce' in its broadest sense comprehends intercourse for the purposes of trade in any form."  <u>Sara Lee Corp. v. Carter</u>, 351 N.C. 27, 32, 519 S.E.2d 308, 311 (1999).  Accordingly, the verified Complaint properly alleges that Greg Fuselier's commercial bribes constituted practices in or affecting commerce. [Verified Complaint, ¶¶ 167 – 169].  The Verified Complaint also properly alleges that Mr. Fuselier bribed TRI's agents, which is an unfair and deceptive act.  [Verified Complaint, ¶¶ 31 – 42].

12.     "A violation of G.S. 14-353 [commercial bribery] should also be considered a violation of G.S. 75-1.1 as an unfair and deceptive trade practice."  <u>Kewaunee Scientific Corp.</u>, 130 N.C. App. at 581, 503 S.E.2d at 420.  See also, <u>Media Network, Inc. v. Long Haymes Carr, Inc.</u>, 678 S.E.2d 671, 684 (N.C. App. 2009) ("if a UDTP claimant can establish that the

- 21 -

defendant committed commercial bribery, that is sufficient to make the UDTP claim"). Thus, Greg Fuselier is liable to TRI under the UDPA for his commercial bribery of TRI's agents.

13.     When a party is injured by a violation of the UDPA, treble damages must be awarded under N.C.G.S.A. § 75-16.

> If any person shall be injured or the business of any person, firm or corporation shall be broken up, destroyed or injured by reason of any act or thing done by any other person, firm or corporation in violation of the provisions of this Chapter, such person, firm or corporation so injured shall have a right of action on account of such injury done, and if damages are assessed in such case judgment shall be rendered in favor of the plaintiff and against the defendant for treble the amount fixed by the verdict.

N.C.G.S.A. § 75-16.  See also, Kewaunee Scientific Corp., 130 N.C. App. at 580, 503 S.E.2d at 420 ("If a violation of Chapter 75 is found, treble damages must be awarded").

14.     As noted above, the total amount of the commercial bribes that Greg Fuselier paid to TRI's agents is $352,948.43.  Thus, the Court finds that Greg Fuselier is liable to TRI on Count One in the total amount of $1,058,845.29, which is the established amount of the commercial bribes trebled under the UDPA.

### B. TRI - Count Two - Fraudulent Billing – Fifth Street Project – Conclusions of Law

1.     Count Two of the Verified Complaint contains well-pleaded allegations of fraud against Greg Fuselier. "The elements of actual fraud, under North Carolina law, are: (1) false representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which in fact does deceive, (5) resulting in damage to the injured party." Godfredson v. JBC Legal Group, P.C.,  387 F. Supp.2d 543, 553 (E.D.N.C. 2005), citing, Terry v. Terry, 302 N.C. 77, 273 S.E.2d 674, 677 (1981).

2.     By virtue of his default, Greg Fuselier has admitted the well-pleaded facts establishing his liability for fraud under Count Two of the Verified Complaint as set forth above in the Court's Findings of Fact.  Nishimatsu Constr. Co., Ltd., 515 F.2d at 1206.

- 22 -

WCSR 4254904v1

3.      As noted above Greg Fuselier intentionally and deceitfully overstated Cornerstone's invoices by a total of $49,704.15 on the Fifth Street project.  [Verified Complaint, ¶¶ 49 – 55].  By virtue of his default, Greg Fuselier has also admitted that TRI reasonably relied to its detriment on his intentionally deceitful misrepresentations when it paid the full and inflated amount of Cornerstone's invoices on the Fifth Street project.  United States v. Givens, 2009 WL 1362764, *5 (W.D. La. 2009) ("For purposes of a default judgment, plaintiff's well-pleaded factual allegations are taken as true-except regarding damages"); see also, Verified Complaint, ¶¶ 56 – 58.

4.      The evidence shows that TRI lost $49,704.15 when it over paid the amount fraudulently invoiced by Greg Fuselier.  [Carpenter Aff., ¶ 3].  Thus, the amount of TRI's damages are established to be $49,704.15 based on the facts admitted by default, and by virtue of the damages established in the Affidavit of Catrina Carpenter.

5.      Count Eleven of the Verified Complaint also alleges that Greg Fuselier is liable under the UDPA for his fraudulent overbilling of TRI on the Fifth Street project.  [Verified Complaint, ¶¶ 166 – 177].  As noted above, the UDPA prohibits "unfair or deceptive acts or practices . . . ."  N.C.G.S.A. § 75-1.1.  "A practice is unfair if it is unethical or unscrupulous, and it is deceptive if it has a tendency to deceive."  Sunbelt Rentals, Inc. v. Head & Engquist Equipment, L.L.C., 174 N.C. App. 49, 59, 620 S.E.2d 222, 230 (2005).  Thus, under North Carolina law, liability for fraud also results in unfair and deceptive trade practices liability under the UDPA.  Davis v. Sellers, 115 N.C. App. 1, 9, 443 S.E.2d 879, 884 (1994) ("A plaintiff who proves fraud thereby establishes that unfair or deceptive acts have occurred in violation of G.S. 75-1.1").

- 23 -

6.      Thus, by admitting the well-pleaded facts establishing his fraud as described above, Greg Fuselier has also admitted facts establishing his liability under the UDPA, as alleged in Count Eleven of the Verified Complaint.  <u>Nishimatsu Constr. Co., Ltd.</u>, 515 F.2d at 1206. Accordingly, "treble damages must be awarded." <u>Kewaunee Scientific Corp.</u>, 130 N.C. App. at 580, 503 S.E.2d at 420.

7.      "Commerce' in its broadest sense comprehends intercourse for the purposes of trade in any form."   <u>Sara Lee Corp.</u>, 351 N.C. at 32, 519 S.E.2d at 311.   Accordingly, the Verified Complaint properly alleges that Greg Fuselier's conduct as described above constituted practices in or affecting commerce.  [Verified Complaint, ¶¶ 167 – 169].

8.      As noted above, TRI sustained $49,704.15 in damages by virtue of Greg Fuselier's fraudulent overbilling on the Fifth Street project.  Therefore, the Court finds that Greg Fuselier is liable to TRI on Count Two of the Verified Complaint in the total amount of $149,112.45, which is the amount of TRI's damages under Count Two trebled under Count Eleven.

### C.  TRI - Count Three – Fraudulent Billing - Custom Shelving – Conclusions of Law

1.      By virtue of his default, Greg Fuselier has admitted the well-pleaded facts establishing his liability for fraud under Count Three of the Verified Complaint.  <u>Nishimatsu Constr. Co., Ltd.</u>, 515 F.2d at 1206.

2.      By virtue of his default, Greg Fuselier has admitted that the amount that he intentionally and deceptively charged TRI for this custom shelving was $4,052.00.  [Verified Complaint, ¶¶ 60 – 68].  By virtue of his default, Greg Fuselier has also admitted that TRI reasonably relied on those misrepresentations to its detriment when it paid this invoice. [Verified Complaint, ¶¶ 67 – 68].

- 24 -

3.      With respect to damages, the Affidavit of Catrina Carpenter shows that TRI lost $4,052.00 when it paid the amount invoiced by Greg Fuselier for this custom shelving in reliance on the deceptive misrepresentations made therein.  [Carpenter Aff., ¶ 4].  Thus, the amount of TRI's damages are established to be $4,052.00 based on the facts admitted by default, and by virtue of the damages established in the Affidavit of Catrina Carpenter.

4.      Count Eleven of the Verified Complaint also alleges that Greg Fuselier is liable under the UDPA for his fraudulent overbilling of TRI as described in Count Three of the Verified Complaint.  [Verified Complaint, ¶¶ 166 – 177].  As noted above, fraud constitutes a violation of the UDPA.  Davis, 115 N.C. App. at 9, 443 S.E.2d at 884.  Thus, by admitting the well-pleaded facts establishing his fraud as described above, Greg Fuselier has also admitted facts establishing his liability under the UDPA, as alleged in Count Eleven of the Verified Complaint.  Accordingly, "treble damages must be awarded."  Kewaunee Scientific Corp., 130 N.C. App. at 580, 503 S.E.2d at 420.

5.      "Commerce' in its broadest sense comprehends intercourse for the purposes of trade in any form."  Sara Lee Corp., 351 N.C. at 32, 519 S.E.2d at 311.  Accordingly, the Verified Complaint properly alleges that Greg Fuselier's conduct as described above constituted practices in or affecting commerce.  [Verified Complaint, ¶¶ 167 – 169].

6.      As noted above, TRI lost $4,052.00 as a result of the fraud described in Count Three of the Verified Complaint.  Therefore, the Court finds that Greg Fuselier is liable to TRI for the fraud described in Count Three of the Verified Complaint in the total amount of $12,156.00, which is the amount of TRI's damages under Count Three trebled under Count Eleven.

- 25 -

### D.  TRI - Count Four – NCI Kickbacks – Conclusions of Law

1.      By virtue of his default, Greg Fuselier has also admitted the well-pleaded facts establishing his liability under Count Four of the Verified Complaint (e.g., that he knowingly took kickbacks from NCI under a fraudulent arrangement he worked out with Mario Gomes). Nishimatsu Constr. Co., Ltd., 515 F.2d at 1206.  More specifically, Greg Fuselier has admitted by default that, in order to improperly increase Cornerstone's profits, Mario Gomes directed NCI to charge TRI 20% more on the Satulah Village-South project, and to then pay this 20% markup to Cornerstone via Greg Fuselier.  [Verified Complaint, ¶¶ 71 – 74 & 78].  By virtue of his default, Greg Fuselier has admitted that NCI increased its charges to TRI by $22,434.00 to cover the cost of the kickbacks it was directed to pay to Cornerstone via Greg Fuselier under this scheme.  [Verified Complaint, ¶¶ 75 – 78].  By virtue of his default, Greg Fuselier has admitted that he received $22,434.00 in payments from NCI under this fraudulent arrangement, knowing that the $22,434.00 constituted kickbacks.  [Verified Complaint, ¶¶ 74 & 78 – 80].  The only thing that is not deemed admitted by virtue of the well-pleaded facts in Count Four of the Verified Complaint, is the amount of TRI's damages.  Givens, 2009 WL 1362764 at *5.

2.      The Affidavit of Catrina Carpenter shows that TRI lost $22,434.00 when it paid NCI the full amounts invoiced by NCI, including the additional 20% that NCI charged TRI in order to cover the kickbacks secretly paid to Cornerstone via Greg Fuselier.  [Carpenter Aff., ¶ 5].  Thus, the amount of TRI's damages under Count Four are established to be $22,434.00 based on the facts admitted by default, and by virtue of the damages established in the Affidavit of Catrina Carpenter.

3.      Count Eleven of the Verified Complaint also alleges that Greg Fuselier is liable to TRI under the UDPA for his participation in the fraudulent scheme described in Count Four of the Verified Complaint.  [Verified Complaint, ¶¶ 166 – 177].  Knowingly receiving kickbacks

- 26 -

under a fraudulent scheme amounts to "unfair or deceptive acts or practices in or affecting commerce" in violation of the UDPA. N.C.G.S.A. § 75-1.1; Sunbelt Rentals, Inc., 174 N.C. App. at 59, 620 S.E.2d at 230 ("A practice is unfair if it is unethical or unscrupulous, and it is deceptive if it has a tendency to deceive"). Thus, by admitting the well-pleaded facts establishing his participation in the NCI kickback scheme as described above, Greg Fuselier has also admitted facts establishing his liability under the UDPA, as alleged in Count Eleven of the Verified Complaint. Accordingly, "treble damages must be awarded." Kewaunee Scientific Corp., 130 N.C. App. at 580, 503 S.E.2d at 420.

4.      "Commerce' in its broadest sense comprehends intercourse for the purposes of trade in any form." Sara Lee Corp., 351 N.C. at 32, 519 S.E.2d at 311. Accordingly, the Verified Complaint properly alleges that Greg Fuselier's conduct as described above constituted practices in or affecting commerce. [Verified Complaint, ¶¶ 167 – 169].

5.      As noted above, TRI sustained $22,434.00 in damages as a result of Greg Fuselier's participation in the fraudulent scheme described in Count Four of the Verified Complaint. Therefore, the Court finds that Greg Fuselier is liable to TRI under Count Four in the total amount of $67,302.00, which is the amount of TRI's damages under Count Four trebled under Count Eleven.

### E.  Summary of TRI's Total Damages

In summary, before trebling under the UDPA, the total amount of TRI's damages under each of the Counts discussed above, is $429,138.58. Accordingly, the Court finds that, after trebling under the UDPA, Greg Fuselier is liable to TRI in the total amount of $1,287,415.00. OEI's claims are discussed in turn below.

WCSR 4254904v1

**F.  OEI - Count Five – Fraudulent Billing – Carpentry – Conclusions of Law**

1.      By virtue of his default, Greg Fuselier has admitted the well-pleaded facts establishing his liability for fraud under Count Five of the Verified Complaint.  Nishimatsu Constr. Co., Ltd., 515 F.2d at 1206.  More specifically, by virtue of his default, Greg Fuselier has admitted that Cornerstone was to be paid on a cost plus basis on the OEI Renovation project, and that the amount of its fee was supposed to be equal to 20% of the charges Cornerstone incurred on the project for subcontracted work and materials.  [Verified Complaint, ¶¶ 83 – 85].  By virtue of his default, Greg Fuselier has admitted that the costs incurred by Cornerstone for carpentry work were only $226,098.00.  [Verified Complaint, ¶¶ 87 – 88].  By virtue of his default, Greg Fuselier has admitted that, in the invoices he submitted to OEI, he intentionally and deceptively misrepresented to OEI that Cornerstone incurred $421,617.00 in costs for carpentry work on the OEI Renovation project.  [Verified Complaint, ¶¶ 86, & 89].  By virtue of his default, Greg Fuselier has admitted that, after he intentionally overstated the costs Cornerstone incurred for carpentry work by $195,519, he then also added a fee equal to 20% of these overstated costs for Cornerstone's overhead and profit, so that he misrepresented and overstated the amounts due for this carpentry work by a total of $234,622.80.  [Verified Complaint, ¶ 90].  By virtue of his default, Greg Fuselier admitted that he made these misrepresentations intending that OEI be deceived into paying Cornerstone the inflated amounts he invoiced for this carpentry work.  [Verified Complaint, ¶¶ 91 – 114].

2.      By virtue of his default, Greg Fuselier has also admitted that OEI reasonably relied on those misrepresentations to its detriment when it paid Cornerstone the full amount of these inflated invoices related to carpentry work.  [Verified Complaint, ¶¶ 95, 99, 103, 107, 111, & 115].  The only thing that is not deemed admitted by virtue of the well-pleaded facts in Count

- 28 -

Five of the Verified Complaint, is the amount of OEI's damages.  <u>Givens</u>,  2009 WL 1362764 at

*5.

3.      The Affidavit of Catrina Carpenter shows that OEI lost a total of $234,622.80

when it paid the full amount of the fraudulently inflated invoices that Greg Fuselier submitted to

OEI for the above-described carpentry work.  [Carpenter Aff., ¶ 6].  Thus, the amount of OEI's

damages are established to be $234,622.80 based on the facts admitted by default, and by virtue

of the damages established in the Affidavit of Catrina Carpenter.

4.      Count Eleven of the Verified Complaint also alleges that Greg Fuselier is liable to

OEI under the UDPA for his fraud described in Count Five of the Verified Complaint.  [Verified

Complaint, ¶¶ 166 – 177].  As noted above, fraud constitutes a violation of the UDPA.  <u>Davis</u>,

115 N.C. App. at 9, 443 S.E.2d at 884.  Thus, by admitting the well-pleaded facts establishing

his fraud as described above, Greg Fuselier has also admitted facts establishing his liability under

the UDPA, as alleged in Count Eleven of the Verified Complaint.  Accordingly, "treble damages

must be awarded." <u>Kewaunee Scientific Corp.</u>,  130 N.C. App. at 580, 503 S.E.2d at 420.

5.      "'Commerce' in its broadest sense comprehends intercourse for the purposes of

trade in any form."  <u>Sara Lee Corp.</u>, 351 N.C. at 32, 519 S.E.2d at 311.  Accordingly, the

Verified Complaint properly alleges that Greg Fuselier's conduct as described above constituted

practices in or affecting commerce.  [Verified Complaint, ¶¶ 167 – 169].

6.      As noted above, OEI sustained $234,622.80 in damages as a result of the fraud

described in Count Five of the Verified Complaint.  Therefore, the Court finds that Greg Fuselier

is liable to OEI on Count Five in the amount of  $703,868.40, which is the amount of OEI's

damages under Count Five trebled under Count Eleven.

WCSR 4254904v1

### G.  OEI - Count Six – Fraudulent Billing – Heated Flooring – Conclusions of Law

1.      By virtue of his default, Greg Fuselier has admitted the well-pleaded facts establishing his liability for fraud under Count Six of the Verified Complaint.  Nishimatsu Constr. Co., Ltd., 515 F.2d at 1206.  More specifically, by virtue of his default, Greg Fuselier has admitted that the costs incurred by Cornerstone for heated flooring were only $35,036.00.  [Verified Complaint, ¶ 119].  By virtue of his default, Greg Fuselier has admitted that, in an invoice he submitted to OEI, he intentionally and deceptively misrepresented that Cornerstone incurred $80,000.00 in costs for this same heated flooring.  [Verified Complaint, ¶¶ 120 & 121].  By virtue of his default, Greg Fuselier has admitted that, after he overstated the costs Cornerstone incurred for heated flooring by $44,964.00, he then also added a fee equal to 20% of these overstated costs for Cornerstone's overhead and profit, so that he misrepresented and overstated the amounts due for this heated flooring by a total of $53,956.80.   [Verified Complaint, ¶¶ 122 & 123].  By virtue of his default, Greg Fuselier has admitted that he made these misrepresentations intending that OEI be deceived into paying Cornerstone the full amounts he invoiced for this heated flooring. [Verified Complaint, ¶ 124].

2.      By virtue of his default, Greg Fuselier has also admitted that OEI reasonably relied on those misrepresentations to its detriment when it paid Cornerstone the full amount of this inflated invoice related to heated flooring.  [Verified Complaint, ¶ 125].  The only thing that is not deemed admitted by virtue of the well-pleaded facts in Count Six of the Verified Complaint, is the amount of OEI's damages.  Givens,  2009 WL 1362764 at *5.

3.      The Affidavit of Catrina Carpenter shows that OEI lost a total of $53,956.80 when it paid the full amount of the fraudulently inflated invoice that Greg Fuselier submitted to OEI for the above-described heated flooring.  [Carpenter Aff., ¶ 7].  Thus, the amount of OEI's

damages are established to be $53,956.80 based on the facts admitted by default, and by virtue of the damages established in the Affidavit of Catrina Carpenter.

4.      Count Eleven of the Verified Complaint also alleges that Greg Fuselier is liable to OEI under the UDPA for his fraud described in Count Six of the Verified Complaint.  [Verified Complaint, ¶¶ 166 – 177].  As noted above, fraud constitutes a violation of the UDPA.  Davis, 115 N.C. App. at 9, 443 S.E.2d at 884.  Thus, by admitting the well-pleaded facts establishing his fraud as described above, Greg Fuselier has also admitted facts establishing his liability under the UDPA, as alleged in Count Eleven of the Verified Complaint.  Accordingly, "treble damages must be awarded." Kewaunee Scientific Corp., 130 N.C. App. at 580, 503 S.E.2d at 420.

5.      "'Commerce' in its broadest sense comprehends intercourse for the purposes of trade in any form."  Sara Lee Corp., 351 N.C. at 32, 519 S.E.2d at 311.  Accordingly, the Verified Complaint properly alleges that Greg Fuselier's conduct as described above constituted practices in or affecting commerce.  [Verified Complaint, ¶¶ 167 – 169].

6.      As noted above, OEI sustained $53,956.80 in damages as a result of the fraud described in Count Six of the Verified Complaint.  Therefore, the Court finds that Greg Fuselier is liable to OEI on Count Six in the amount of  $161,870.40, which is the amount of OEI's damages under Count Six trebled under Count Eleven.

### H.  OEI - Count Seven – Fraudulent Billing - Marble – Conclusions of Law

1.      By virtue of his default, Greg Fuselier has admitted the well-pleaded facts establishing his liability for fraud under Count Seven of the Verified Complaint.  Nishimatsu Constr. Co., Ltd., 515 F.2d at 1206.  More specifically, by virtue of his default, Greg Fuselier has admitted that the costs incurred by Cornerstone for white Carrara marble were only $77,331.00.  [Verified Complaint, ¶ 128].  By virtue of his default, Greg Fuselier has admitted that, in an invoice he submitted to OEI, he intentionally and deceptively misrepresented that Cornerstone

- 31 -

incurred $111,750.00 in costs for this white Carrara marble.  [Verified Complaint, ¶¶ 129 &

132].  By virtue of his default, Greg Fuselier has admitted that, after he overstated the costs

Cornerstone incurred for white Carrara marble by $34,419.00, he then also added a fee equal to

20% of these overstated costs for Cornerstone's overhead and profit, so that he misrepresented

and overstated the amounts due for this white Carrara marble by a total of $41,302.80.  [Verified

Complaint, ¶ 130].  By virtue of his default, Greg Fuselier has admitted that he made these

misrepresentations intending that OEI be deceived into paying Cornerstone the full amounts he

invoiced for this white Carrara marble.  [Verified Complaint, ¶132].

       2.       By virtue of his default, Greg Fuselier has also admitted that OEI reasonably

relied on those misrepresentations to its detriment when it paid Cornerstone the full amount of

this inflated invoice related to white Carrara marble.  [Verified Complaint, ¶ 133].  The only

thing that is not deemed admitted by virtue of the well-pleaded facts in Count Seven of the

Verified Complaint, is the amount of OEI's damages.  <u>Givens</u>,  2009 WL 1362764 at *5.

       3.       The Affidavit of Catrina Carpenter shows that OEI lost a total of $41,302.80

when it paid the full amount of the fraudulently inflated invoice that Greg Fuselier submitted to

OEI for the above-described white Carrara marble.  [Carpenter Aff., ¶ 8].  Thus, the amount of

OEI's damages are established to be $41,302.80 based on the facts admitted by default, and by

virtue of the damages established in the Affidavit of Catrina Carpenter.

       4.       Count Eleven of the Verified Complaint also alleges that Greg Fuselier is liable to

OEI under the UDPA for his fraud described in Count Seven of the Verified Complaint.

[Verified Complaint, ¶¶ 166 – 177].  As noted above, fraud constitutes a violation of the UDPA.

<u>Davis</u>, 115 N.C. App. at 9, 443 S.E.2d at 884.  Thus, by admitting the well-pleaded facts

establishing his fraud as described above, Greg Fuselier has also admitted facts establishing his

liability under the UDPA, as alleged in Count Eleven of the Verified Complaint.  Accordingly, "treble damages must be awarded." <u>Kewaunee Scientific Corp.</u>, 130 N.C. App. at 580, 503 S.E.2d at 420.

5.      "'Commerce' in its broadest sense comprehends intercourse for the purposes of trade in any form."  <u>Sara Lee Corp.</u>, 351 N.C. at 32, 519 S.E.2d at 311.  Accordingly, the Verified Complaint properly alleges that Greg Fuselier's conduct as described above constituted practices in or affecting commerce.  [Verified Complaint, ¶¶ 167 – 169].

6.      As noted above, OEI sustained $41,302.80 in damages as a result of the fraud described in Count Seven of the Verified Complaint.  Therefore, the Court finds that Greg Fuselier is liable to OEI on Count Seven in the amount of  $123,908.40, which is the amount of OEI's damages under Count Seven trebled under Count Eleven.

### I.  OEI - Count Eight – Fraudulent Billing – Electrical – Conclusions of Law

1.      By virtue of his default, Greg Fuselier has admitted the well-pleaded facts establishing his liability for fraud under Count Eight of the Complaint (e.g., that he deceitfully billed OEI for electrical work that was not performed for OEI).  <u>Nishimatsu Constr. Co., Ltd.</u>, 515 F.2d at 1206.  More specifically, by virtue of his default, Greg Fuselier has admitted that, when he prepared and submitted a Cornerstone invoice to OEI on the OEI Renovation project, he intentionally and deceitfully blended in a charge of $15,188.26 for electrical work that was done on Mario Gomes' home.  [Verified Complaint, ¶¶ 136 – 138].  By virtue of his default, Greg Fuselier has also admitted that, after he deceitfully blended in a charge of $15,188.26 for this electrical work, he then also added a fee equal to 20% of these costs for Cornerstone's overhead and profit, so that he misrepresented and overstated the amount due to Cornerstone by a total of $18,225.00.  [Verified Complaint, ¶ 139].  By virtue of his default, Greg Fuselier has admitted

that he made these misrepresentations intending that OEI be deceived into paying Cornerstone the full amounts he invoiced for this electrical work. [Verified Complaint, ¶ 140].

2.      By virtue of his default, Greg Fuselier has also admitted that OEI reasonably relied to its detriment on these misrepresentations when it paid the full amount of this invoice. [Verified Complaint, ¶ 141].  The only thing that is not deemed admitted by virtue of the well-pleaded facts in Count Eight of the Verified Complaint, is the amount of OEI's damages. Givens,  2009 WL 1362764 at *5.

3.      The Affidavit of Catrina Carpenter shows that OEI lost $18,225.00 when it paid the amount fraudulently invoiced to OEI by Greg Fuselier for this electrical work that was done on the home of Mario Gomes.  [Carpenter Aff., 9].  Thus, the amount of OEI's damages are established to be $18,225.00 based on the facts admitted by default, and by virtue of the damages established in the Affidavit of Catrina Carpenter.

4.      Count Eleven of the Verified Complaint also alleges that Greg Fuselier is liable to OEI under the UDPA for his fraud described in Count Eight of the Verified Complaint. [Verified Complaint, ¶¶ 166 – 177]. As noted above, fraud constitutes a violation of the UDPA. Davis,  115 N.C. App. at 9, 443 S.E.2d at 884.   Thus, by admitting the well-pleaded facts establishing his fraud as described above, Greg Fuselier has also admitted facts establishing his liability under the UDPA, as alleged in Count Eleven of the Verified Complaint.  Accordingly, "treble damages must be awarded." Kewaunee Scientific Corp.,  130 N.C. App. at 580, 503 S.E.2d at 420.

5.      "'Commerce' in its broadest sense comprehends intercourse for the purposes of trade in any form."  Sara Lee Corp., 351 N.C. at 32, 519 S.E.2d at 311.  Accordingly, the

Verified Complaint properly alleges that Greg Fuselier's conduct as described above constituted practices in or affecting commerce.  [Verified Complaint, ¶¶ 167 – 169].

6.      As noted above, OEI sustained $18,225.00 in damages as a result of the fraud described in Count Eight of the Verified Complaint.   Therefore, the Court finds that Greg Fuselier is liable to OEI on Count Eight in the amount of  $54,675.00, which is the amount of OEI's damages under Count Eight trebled under Count Eleven.

7.      The total amount of OEI's losses as a result of the fraud at issue in Counts Five, Six, Seven, and Eight, as described above, is $348,107.40.  This is the amount that OEI lost as a result of Greg Fuselier's above-described misrepresentations related to carpentry work, heated flooring, white Carrara marble, and electrical work.  These damages are included within the total amount claimed by OEI under Count Nine discussed below.  [Carpenter Aff., ¶ 11].

**J. OEI Count Nine – Fraudulent Billing – Grossly Excessive Costs – Conclusions of Law**

1.      By virtue of his default, Greg Fuselier has admitted the well-pleaded facts establishing his liability for fraud under Count Nine of the Complaint (e.g., that he submitted bills to OEI in which he deliberately and grossly over-charged OEI for Cornerstone's work on the OEI Renovation project).  Nishimatsu Constr. Co., Ltd., 515 F.2d at 1206.

2.      More specifically, by virtue of his default, Greg Fuselier has admitted that Cornerstone was to be paid on a cost plus basis on the OEI Renovation project, and that the amount of its fee was supposed to be equal to 20% of the charges Cornerstone properly and reasonably incurred on the project for subcontracted work and materials.  [Verified Complaint, ¶¶ 83 & 84].  By virtue of his default, Greg Fuselier has admitted that, in the invoices he prepared and submitted to OEI, he intentionally and deceptively misrepresented and inflated the costs that Cornerstone incurred on the OEI Renovation project so that OEI paid Cornerstone

$701,217.12 more than Cornerstone was entitled to be paid under the cost plus billing arrangement at issue.  [Verified Complaint, ¶¶ 144 – 154].

3.      The Affidavit of Catrina Carpenter shows that OEI over-paid Cornerstone by a total of $701,217.12 when it paid the full amount of the first 8 of 10 inflated invoices that Greg Fuselier prepared and submitted to OEI on the OEI Renovation project, and that OEI made those payments in reliance on the misrepresentations he made in those invoices.  [Carpenter Aff., ¶ 11].

4.      As noted above in connection with Counts Five, Six, Seven, and Eight of the Verified Complaint, Cornerstone's overbilling of OEI for carpentry work, heated flooring, basket weave white Carrara marble, and electrical work totals $348,107.40.  This $348,107.40 amount is included within the $701,217.00 in losses that OEI sustained as a result of Greg Fuselier's overbilling that is described in Count Nine of the Verified Complaint.  [Carpenter Aff., ¶ 11].  Thus, the net additional losses OEI sustained by virtue of the fraud described in Count Nine is $353,109.72.

5.      Count Eleven of the Verified Complaint also alleges that Greg Fuselier is liable to OEI under the UDPA for his fraud described in Count Nine of the Verified Complaint.  [Verified Complaint, ¶¶ 166 – 177].  As noted above, fraud constitutes a violation of the UDPA.  Davis, 115 N.C. App. at 9, 443 S.E.2d at 884.  Thus, by admitting the well-pleaded facts establishing his fraud as described above, Greg Fuselier has also admitted facts establishing his liability under the UDPA, as alleged in Count Eleven of the Verified Complaint.  Accordingly, "treble damages must be awarded." Kewaunee Scientific Corp., 130 N.C. App. at 580, 503 S.E.2d at 420.

6.      "Commerce' in its broadest sense comprehends intercourse for the purposes of trade in any form." Sara Lee Corp., 351 N.C. at 32, 519 S.E.2d at 311.  Accordingly, the

Verified Complaint properly alleges that Greg Fuselier's conduct as described above constituted practices in or affecting commerce. [Verified Complaint, ¶¶ 167 – 169].

7.    As noted above, OEI sustained net additional damages of $353,109.72 as a result of the fraud described in Count Nine of the Verified Complaint. Therefore, the Court finds that Greg Fuselier is liable to OEI on Count Nine in the amount of $1,059,329.16, which is the net additional amount of OEI's damages under Count Nine trebled under Count Eleven.

### K.  Summary of OEI's Damages

In summary, the Court finds that OEI sustained $429,138.50 in losses as a result of the actions of Greg Fuselier as described in the Verified Complaint. Thus, after trebling under the UDPA, the Court finds that Greg Fuselier is liable to OEI in the total amount of $2,103,651.00.

### L.  Nondischargability

1.    "The Bankruptcy Code has long prohibited debtors from discharging liabilities incurred on account of their fraud, embodying a basic policy animating the Code of affording relief only to an 'honest but unfortunate debtor.'" Cohen v. de la Cruz, 523 U.S. 213, 217, 118 S.Ct. 1212, 1216 (1998), quoting, Grogan v. Garner, 498 U.S. 279, 287, 111 S.Ct. 654, 659-660, 112 L.Ed.2d 755 (1991). Thus, "Section 523(a)(2)(A) of the Bankruptcy Code (Code) excepts from discharge in bankruptcy "any debt . . . for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by . . . false pretenses, a false representation, or actual fraud." Cohen v. de la Cruz, 523 U.S. 213, 215, 118 S.Ct. 1212, 1214 (U.S.,1998), quoting, 11 U.S.C. § 523(a)(2)(A).

> Moreover, "§ 523(a)(2)(A) has been interpreted to make nondischargeable the loss or damage sustained by a creditor as a result of being induced into virtually any type of business transaction by fraud, false representations or false pretenses on the part of the debtor." In re Bozzano, 173 B.R. at 992. As used in this section, false pretenses and misrepresentations include "implied misrepresentations or conduct intended to create and foster a false impression". Id., at 993. Such "representations [are] not made in isolation and do not stand alone" but are

- 37 -

"examined in the context in which they were made" for a determination of whether debtor knew them to be false. *Id*.

In re Bebber, 192 B.R. 120, 123 (W.D.N.C. 1995).

2.      Likewise, Section 523(a)(6) also excepts from discharge any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity . . . ."  11 U.S.C.A. § 523(a)(6).

3.      In this case the debtor, Greg Fuselier, incurred the debts at issue by virtue of his participation in the fraudulent kickback scheme described in the Verified Complaint.  Under this scheme, Greg Fuselier incurred the debts at issue by virtue of false pretenses, false representations, and actual fraud, as well as willful and malicious injury inflicted.

4.      Thus, all the debts at issue in this case fall within 11 U.S.C.A. §§ 523(a)(2)(A) and/or 523(a)(6), including the claims for treble damages under the UDPA.  See e.g., Cohen v. de la Cruz, 523 U.S. 213, 223, 118 S. Ct. 1212, 1219 (1998) ("We hold that § 523(a)(2)(A) prevents the discharge of all liability arising from fraud, and that an award of treble damages therefore falls within the scope of the exception").

5.      Thus, the Court finds that the claims at issue in the Verified Complaint are nondischargeable and enters judgment by default against Greg Fuselier and in favor of TRI and OEI accordingly.

**WHEREFORE**, the Court hereby enters judgment by default against Greg Fuselier and in favor of TRI Investments, Inc. in the total amount of $1,287,415.00.

The Court hereby enters judgment by default against Greg Fuselier and in favor of Old Edwards Inn and Spa, LLC in the total amount of $2,103,651.00.

SO ORDERED, this 13th day of January, 2010.

_____

Judge Elizabeth Magner

WCSR 4254904v1